**GOVERNMENT LAND BANK,
Plaintiff, Appellee,**

v.

**GENERAL SERVICES ADMINISTRA-
TION, Defendant, Appellant.**

**No. 81–1550.**

United States Court of Appeals,
First Circuit.

Argued Dec. 7, 1981.

Decided Feb. 24, 1982.

Wendy M. Keats, Atty. Civ. Div., Appellate Staff, Dept. of Justice, Washington, D. C., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., Stuart E. Schiffer, Acting Asst. Atty. Gen. and Leonard Schaitman, Atty. Civ. Div., Appellate Staff, Dept. of Justice, Washington, D. C., were on brief, for defendant, appellant.

John M. Conley, with whom Norman T. Byrnes, and Gaston Snow & Ely Bartlett, Boston, Mass., were on brief for plaintiff, appellee.

Before COFFIN, Chief Judge, BOWNES and BREYER, Circuit Judges.

COFFIN, Chief Judge.

In this case arising under the Freedom of Information Act, we are asked to decide whether the Act requires the General Services Administration (GSA) to disclose an appraisal of realty to a state agency that is seeking to buy the property from GSA.

*The Facts: GSA and the Land Bank*

The plaintiff, Government Land Bank (Land Bank), is an agency of the Commonwealth of Massachusetts whose principal function is to acquire land for eventual redisposition to state agencies and private parties for publicly beneficial use. Defendant GSA is a United States government agency empowered to sell certain surplus federal property.

In May, 1978, GSA determined that five tracts of vacant military family housing at the former Westover Air Force Base in Chicopee, Massachusetts, were surplus real property. In January, 1979, the Land Bank

expressed interest in purchasing the land on behalf of the city of Chicopee. That June, GSA received an appraisal report from a professional real estate appraiser, and in December it offered the property to the Land Bank for $3,260,000 (a price it raised to $3,565,000 in June, 1980). The Land Bank believed that the property was worth no more than approximately 30 per cent of GSA's asking price, and it pressed GSA to justify its offer. In March, 1980, it filed a formal request under the Freedom of Information Act (FOIA), for a copy of the appraisal and any "internal staff memoranda relating to the determination of the $3,260,-000 price".

GSA refused to reveal the appraisal report and related memoranda, invoking FOIA's exemption for intra-agency memoranda. After exhausting administrative remedies, the Land Bank sought injunctive relief in federal district court. The court ordered GSA to disclose the appraisal and supporting memoranda, but ordered the Land Bank not to release any of that material to any person or organization without first obtaining permission from the court. GSA appeals.

*Background: FOIA and the Government in the Marketplace*

FOIA establishes a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language". S.Rep. No. 813, 89th Cong., 1st Sess. 3 (1965). Moreover, because the dominant objective of the Act is disclosure, the exemptions are narrowly construed. *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976).

■ Under Exemption 5 of the Act, 5 U.S.C. § 552(b)(5), an agency need not disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." Both parties agree that a property appraisal, performed under contract by an independent professional, is an "intra-agency" document for purposes of the exemption. *See Hoover v. United States Dep't of the Interior*, 611 F.2d 1132, 1137–38 (5th Cir. 1980); Note, *The Freedom of Information Act and the Exemption for Intra-Agency Memoranda*, 86 Harv.L.Rev. 1047, 1063–66 (1973). The point of dispute is whether such an appraisal "would not be available by law to a party ... in litigation with the agency".

■ In *Federal Open Market Committee v. Merrill*, 443 U.S. 340, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979), the Supreme Court discussed the scope of Exemption 5. It observed first that "it is not clear that Exemption 5 was intended to incorporate every privilege known to civil discovery". *Id.* at 354, 99 S.Ct. at 2809. After analyzing the legislative history of the exemption, however, the Court concluded that it incorporates a qualified privilege for confidential commercial information generated in the process of awarding a contract. "The theory behind [this] privilege is ... that the Government will be placed at a competitive disadvantage or that the consummation of the contract may be endangered." *Id.* at 360, 99 S.Ct. at 2812. We interpret the case as holding that Exemption 5 protects the government when it enters the marketplace as an ordinary commercial buyer or seller.[1] The protection is limited to what is essential,[2] but FOIA should not be used to allow the government's customers to pick the taxpayers' pockets.

---

**1.** *Merrill* may even go farther. There, the Supreme Court remanded for consideration whether the exemption applied to a policy directive regulating financial markets; the threatened harm was to agency policy rather than the agency budget. *See* 443 U.S. at 363–64, 99 S.Ct. at 2813–14; *id.* at 366 n.2, 99 S.Ct. at 2815 n.2 (dissenting opinion). The limited characterization found in the text above is adequate to dispose of the case before us.

**2.** Thus, there is an explicit time limitation on Exemption 5 documents: "[T]he rationale for protecting such information expires as soon as the contract is awarded or the offer withdrawn." 443 U.S. at 360, 99 S.Ct. at 2812. We note that here GSA has agreed to release the appraisal as soon as it sells the land or withdraws it from the market.

A realty appraisal generated by a government agency to help it sell property is covered by the exemption. *Merrill* held that the exemption prevails where the document contains "sensitive information not otherwise available", and disclosure would significantly harm the government's commercial interests. *Id.* at 363, 99 S.Ct. at 2813. When an agency such as GSA is about to dispose of realty, its own expert's appraisal of value is sensitive: it is a critical factor in computing its initial asking price and its rock bottom price. Moreover, the appraisal is "not otherwise available": anyone could have the property appraised, but the agency's own appraiser does not reveal his conclusions outside the agency. Finally, presale disclosure would harm the agency's commercial interests in at least two ways. If the agency has set its initial asking price above the appraised value, disclosure would encourage prospective buyers to hold out for a lower figure. Perhaps even more significantly, a prospective buyer could use the information as a political shillelagh, citing the discrepancy between appraisal and asking price as evidence of agency "gouging".[3] Such a course of events is especially likely when one prospective buyer is a state agency, both subject to and with access to its own political pressures.

We conclude that appraisals such as the one at issue in this case are prime candidates for exemption under *Merrill*. See also *Hoover v. Dep't of Interior, supra; Martin Marietta Aluminum, Inc. v. Administrator,* 444 F.Supp. 945 (C.D.Cal.1977). Of course in each case the agency must demonstrate that the document is amenable to the sort of analysis set forth here. GSA has carried that burden in this case.

*Foreground: GSA, The Land Bank, and FOIA*

The Land Bank offers several theories for refusing to apply Exemption 5 to its request. First, it argues that the GSA appraisal lies outside the language of the exemption because it would be discoverable in civil litigation. Although the Land Bank

concedes that several cases have refused to order discovery of appraisals as a matter of course, *see, e.g., United States v. 145.31 Acres of Land,* 54 F.R.D. 359, 360 (M.D.Pa. 1972) (declining to order government to reveal location of appraisal report in response to interrogatory), *aff'd,* 485 F.2d 682 (3d Cir. 1973); *United States v. John R. Piquette Corp.,* 52 F.R.D. 370, 373 (E.D.Mich. 1971), it deems those cases distinguishable because there the appraisals were prepared for use in litigation. Moreover, it argues that the Fifth Circuit's reliance on those cases in *Hoover v. Dep't of Interior, supra,* was necessary to prevent the litigants from using FOIA to circumvent normal discovery procedures. The Land Bank notes that no litigation (other than this FOIA suit) is possible with GSA.

■ . This argument misconceives the purpose of Exemption 5's language, "which would not be available by law to a party ... in litigation with the agency". The Land Bank would have us construe the language so that Exemption 5 would only be applied where a litigant seeks to use FOIA to circumvent normal discovery procedures. Such a construction was not the intent of Congress. Rather, the reference to discovery rules was intended to ensure that Exemption 5 not become so big that members of the public (using FOIA) were denied access to documents that were *routinely* discoverable in private litigation. *See EPA v. Mink,* 410 U.S. 73, 85–86, 93 S.Ct. 827, 835, 35 L.Ed.2d 119 (1973); H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966). The test is not whether FOIA is being used to circumvent the discovery process. The test is whether the document (1) falls within an area of clear Congressional concern and (2) is not the sort of material that private litigants can get as a matter of course. Since *Merrill* identified a Congressional concern that clearly encompasses this appraisal, and since it is not the sort of document routinely disclosed to litigants, the test would seem to be met.

---

**3.** Such a discrepancy can, of course, be fully consistent with legitimate agency objectives.

See H.Rep.No. 1763, 85th Cong., 2d Sess., quoted in text *infra.*

Alternatively, the Land Bank contends that the exemption should not be applied to its requests since GSA owes it special obligations. It cites 41 C.F.R. §§ 101–47.303–2, 101–47.304–9(a)(4), which require GSA to pursue a negotiated sale with state agencies before proceeding to a public auction. It reasons that these regulations remove its relationship with GSA from the ordinary world of commercial bargaining and thereby render the "commercial information" exemption irrelevant. It argues further that the order of the district court, which prohibits circulation of the appraisal among the general public, adequately protects GSA's commercial interests. We find this analysis flawed, both in its characterization of the relationship between GSA and the Land Bank, and in its unstated premise that Exemption 5 allows a document to be exempt from disclosure to one class of plaintiffs, but subject to disclosure to another.

■ GSA's principal obligations in directing the disposal of surplus property are set forth in 40 U.S.C. § 484(e). It provides generally that all disposals of surplus property "*shall* be made after publicly advertising for bids", with an award to the bid that "will be most advantageous to the federal Government, price and other factors considered". (Emphasis added.) The legislation qualifies that general mission by giving the Administration some discretion under certain circumstances. Thus, rather than advertising for bids, the disposal "*may* be negotiated, under regulations prescribed by the Administrator [if] the disposal will be to States, Territories, possessions, political subdivisions thereof, or tax-supported agencies therein, and the estimated fair market value of the property and other satisfactory terms of disposal are obtained by negotiation". 40 U.S.C. § 484(e)(3)(H). (Emphasis added.) This option is permissive, not mandatory. The use of the auxiliary verb "may", rather than "shall", confirms the Administrator's authority to reject a negotiated disposal, even if the state offers to pay the estimated fair market value of the property.

Moreover, the legislative history of the provision confirms that negotiated disposal was not intended to be a "preferred method". Indeed, it reveals the legislators' distrust for appraisals and its desire that the Administrator do better than the appraised value whenever feasible:

"[D]isposal of Government surplus property should not be made by negotiation except under those very unusual circumstances where such method would be in the public interest and assure the Government of a fair market value return. Of particular alarm has been the great number of unrealistic appraisals on which negotiated sales price was based. Perhaps this stems to some extent from the possibility that local appraisers are inclined to be more sympathetic to the local private interests than to the general public interest as represented by the United States Government.

. . . [N]egotiating authority should be exercised sparingly, and only in those instances where it would clearly be in the best interest of the Government." H.Rep. No. 1763, 85th Cong., 2d Sess., *reprinted in* [1958] U.S.Code Cong. & Ad. News 2861, 2866.

Thus, the statute was clearly intended to keep the relationship between GSA and the Land Bank a competitive, arm's-length, commercial affair.

Nor are GSA's regulations inconsistent with that legislative intent. 41 C.F.R. § 101–47.303–2 requires that GSA notify local public agencies of available surplus property before it advertises for bids. It requires GSA to give any interested agencies time to develop and submit formal applications for the property. Once an application is received, GSA is required only to "consider and act upon it in accordance with the provisions of the statute and applicable regulations". And 41 C.F.R. § 101–47.304–9(a)(4) is no more than a paraphrase of 40 U.S.C. § 484(e)(3)(H). When read against the statutory background, these regulations appear to give the public agencies no more than a right of first refusal. We see no reason to interpret them as derogating from GSA's efforts to satisfy its

statutory duties by obtaining the price it considers fair. *Cf.* 40 U.S.C. § 484(e)(2)(C) (where disposal is by auction sale, GSA may choose to reject all bids if none is adequate).

Even if there were validity to the plaintiff's contention that it is a "preferred buyer", our conclusion here would not be affected. Although such a preference might give the plaintiff additional rights under the Federal Property and Administrative Services Act of 1949, as amended, it has no relevance in a suit under FOIA. The issue of whether disclosure is required by FOIA turns on the nature of *the document*, not the particular party requesting it. Thus, an individual applicant's need for information is not to be taken into account in determining whether materials are exempt. *Federal Open Market Committee v. Merrill, supra,* 443 U.S. at 362–63, 99 S.Ct. at 2813; *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 149 n.16, 95 S.Ct. 1504, 1515 n.16, 44 L.Ed.2d 29 (1975); *EPA v. Mink, supra,* 410 U.S. at 86, 93 S.Ct. at 835.[4]

*The judgment of the district court is vacated. The case is remanded with instructions that judgment be entered for the defendant.*

---

**4.** Given our conclusions, we need not consider GSA's alternative argument that the docu-

ments were protected under Exemption 5's doctrine of "executive privilege".